Case 1:20-mj-00200
Assigned to: Judge G. Michael Harvey
Assign Date: 10/08/2020
Description: COMPLAINT W/ARREST WARRANT

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR COMPLAINT AND ARREST WARRANT

I, FBI Agent Erin Sheridan, (hereinafter "Your Affiant"), being duly sworn, depose and state as follows:

## INTRODUCTION

1. Your Affiant, is a Federal Agent, authorized to investigate violations of the laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants issued under the authority of the United States. I am a Special Agent with the Federal Bureau of Investigation ("FBI") currently assigned to the Washington Field Office's Violent Crimes Task Force. Prior to this assignment, Your Affiant was in the San Juan and New York Field Divisions. Your Affiant has been employed by the FBI for twenty-four years and as a duly appointed Special Agent since October 2000. As a result of my training and experience, I am familiar with the tactics, methods and techniques utilized by those who commit violent crimes.

2. As a Special Agent with the FBI, Your Affiant has worked on cases involving violent crimes, including serial murder, serial sexual assaults, cold cases, police killings, bank robberies, threats, crimes against children, and kidnappings; extraterritorial crimes, including crimes on the high seas and sexual assaults to U.S. persons; as well as terrorism related and counterintelligence investigations.

3. The information set forth in this affidavit is known to me as a result of an investigation personally conducted by me and by other law enforcement agents. Thus, the statements contained in this affidavit are based in part on information provided to me by other agents, Department of State investigators and the FBI. Statements in this affidavit are also based in part on a review of records obtained during the investigation, interviews, documents

1

obtained during the execution of search warrants/subpoenas, and my training and experience as a law enforcement officer.

4. This affidavit is being submitted for the limited purpose of enabling this Court to make a judicial determination of probable cause to issue an arrest warrant. I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only those facts that I believe are sufficient to establish the necessary foundation for the warrant.

5. This affidavit is made in support of an application for criminal complaint and arrest warrant for **Brian Jeffrey Raymond** (date of birth ████████) for a violation of 18 U.S.C § 2422(a) (inducing an individual to travel for the purpose of engaging in any sexual activity for which any person can be charged with a criminal offense).

## PROBABLE CAUSE

6. On May 31, 2020, the Department of State, Diplomatic Security Service ("DSS") and FBI began investigating **Raymond** after he was detained by foreign law enforecement outside of his apartment overseas. At the time, Raymond was a U.S. government employee working at a U.S. Embassy in a foreign country and lived in embassy-leased housing. Raymond has since resigned from his U.S. government position. As a part of that investigation, DSS obtained warrants for the seizure and search of two of **Raymond's** cellular phones from his person, as well as several other electronic devices from his overseas residence. Federal law enforcement separately obtained a warrant for **Raymond's** iCloud account. After conducting a forensic examination of these devices and reviewing the iCloud account, law enforcement recovered multiple items of investigative interest. First, internet artifacts on **Raymond**'s phones revealed a number of relevant

searches.  For example, there were searches for "passed out black girl," on February 8, 2020, for "passed out gorl," on February 22, 2020, and for "deep sleep" on February 23, 2020.  There were multiple videos of unconscious or "passed out" women in his YouTube viewing history.  Moreover, law enforcement discovered internet artifacts on one of **Raymond's** ASUS laptops revealing searches for: "passed out," "ambien," "ambien and alcohol side effects, Zolpidem Tartrate tablets and 10mg," "Ambien," "dissolve," "Zolpidem and pharmacies," "Ambien and alcohol and pass out," "passed out and carried," and "deep sleep" between 2010 and 2011.

7. Recovered from Raymond's iPhone XR and his iCloud account were two video fragments and eight photographs of an adult female (hereinafter AV-4, adult victim 4) that were taken on or about May 14, 2017.  In the videos and photographs, AV-4 is lying down on her back on a bed.  Her eyes are closed and she appears unconscious.  She is depicted in several photographs with her shirt pulled up and her bra pulled down so that both breasts are visible.  In another, her bra is on but her shirt is pulled up.  In one of the video fragments, a hand can be seen pulling at AV-4's shorts, briefly exposing her upper pubic region.  One photograph depicts a hand holding open AV-4's eyelids, exposing her eyeballs.  Red marks are visible on both of AV-4's knees in several of the videos and images.

8.  An iMessage chat conversation between **Raymond** and AV-4 was also recovered from Raymond's iCloud account.  In the conversation, on April 18, 2017, **Raymond** asks AV-4 if she is in "DC or VA."  She confirms that she is in Virginia, and he says that he is too. He suggests meeting at Barrel & Bushel restaurant in Virginia, which they appear to do on April 26.  They continue texting following their first date, and, on May 13, 2017, **Raymond** suggests meeting at Dumbarton Oaks at 1703 32nd Street NW in Washington, D.C. at 4:30

p.m. the next day.  On May 14, 2017, text messages between Raymond and AV-4 show Raymond directing AV-4 towards his location near Dumbarton Oaks where he is awaiting her arrival.  The text conversation continues several hours later, with **Raymond** and AV-4 eventually going from D.C. to an apartment at an address located in Virginia.   The following morning, on May 15, **Raymond** messages AV-4, saying, "hopefully you aren't too hung over today."   She responds, "Hey!   Yesterday was rough.   I had a massive hangover… lol.  I had fun too!  We have to do it again."  The two continue to converse for a while after this, with both of them suggesting another meeting, but the messages do not reveal that any other meeting actually took place.  At one point, **Raymond** said he could meet with AV-4 but not at his place because it was messy, and AV-4 said yes, but then changed her mind and said she could not meet.

9.  Your Affiant located and interviewed AV-4, who reported that she met **Raymond** in the Spring of 2017 while on the Tinder dating application.  A preliminary interview of AV-4 was conducted on September 22, 2020, after which AV-4 was shown the video and photographs described above.  A full interview took place on September 25.  During the interviews, AV-4 explained that **Raymond** and AV-4 exchanged chat messages and went on their first date in the Tysons, Virginia area, where they met at the Barrel & Bushel restaurant.

10. AV-4 reported that on May 14, 2017, after exchanging additional chat messages with **Raymond,** she met **Raymond** for a second date. **Raymond** suggested they meet at Dumbarton Oaks, near Georgetown in Washington, D.C. AV-4 and **Raymond** drove separately to the area, met, and walked the property which was filled with flower gardens and art displays.  AV-4 brought two "juice boxes" of Soju, a Korean liquor, for **Raymond**

and AV-4 to drink while they walked around.  Later, they walked to the Bistrot Lepic and Wine Bar, where they each ordered one or two glasses of wine and continued to converse. AV-4 stated that **Raymond** seemed to know the menu very well, and she assumed he had taken women there before.  While at Bistrot Lepic, **Raymond** expressed that he wanted to continue the date but said or implied that his apartment was unavailable.  AV-4 then agreed to continue the date and offered her apartment in Virginia as an alternative.

11. AV-4 reported that she and **Raymond** left the wine bar and traveled separately from Washington, D.C. to Virginia.   AV-4 resided at an apartment building in Virginia. **Raymond** followed AV-4 home and was directed to park in the visitor's parking lot.  AV-4 escorted **Raymond** into her building.

12. AV-4 reported that she and **Raymond** entered her apartment, and AV-4 opened a bottle of red wine, poured a glass for each of them, and showed Raymond around.  AV-4 and **Raymond** then walked out onto her balcony with their wine glasses, leaving the bottle inside.  At some point, **Raymond** went inside to use the restroom while AV-4 remained on the balcony.  Upon his return, he brought the open bottle of wine out to the balcony and refilled their glasses.  A short amount of time later, AV-4 became "woozy," her legs gave out from underneath her, and she dropped to her knees while on the balcony.  **Raymond** attempted to hold her steady.  She informed **Raymond** that she was not feeling well and wanted to lie down in her bedroom on the bed.

13. After an unknown amount of time passed, AV-4 awoke on the top of her bed, fully clothed with **Raymond** lying next to her on his side, also fully clothed except for his shoes.  AV-4 stated that **Raymond** seemed surprised that she woke up.  She told him that if he had too much to drink he could stay on her living room couch.  **Raymond** declined and said he was

5

fine, walked to the door, put on his shoes, and left the apartment. AV-4 took notice that he easily put on his shoes and felt that **Raymond** did not appear to be intoxicated. AV-4 has no memory of anything that occurred from when she stated she needed to lie down until she awoke next to **Raymond**.

14. AV-4 stated that she had never "blacked-out" before from drinking alcohol and has not "blacked out" since. AV-4 said that, to her knowledge, she and **Raymond** were not physically intimate and did not even kiss at any point. She stated that, as far as she is aware, the most that happened between them was possibly a hug at some point during one of their dates. AV-4 said that she and **Raymond** continued to converse after this second date, but they never met again.

15. AV-4 stated that she did not give **Raymond** consent to remove her clothing, expose her breasts, video record her, or take pictures of her. Upon viewing the eight aforementioned photographs and the two video fragments depicting the same female partially covered with breasts exposed on September 22, AV-4 positively identified herself, her tattoos, her bedroom, and her bed sheets.

16. Your Affiant knows that video recording someone who is unconscious without their consent, touching the material covering the unconscious person's intimate areas (including that person's genitalia, anus, groin, breast, or buttocks) without their consent, and creating depictions of that individual's breasts without their consent constitute "sexual activity for which any person can be charged with a criminal offense" because they are violations of state law. For example, Your Affiant knows that this conduct is prohibited by D.C. Code § 22-3531 (voyeurism), D.C. Code § 22-3005 (fourth-degree sexual abuse), D.C. Code § 22-3006 (misdemeanor sexual abuse), Virginia § 18.2-67.3 (aggravated sexual battery),

Virginia § 18.2-67.4 (sexual battery) and Virginia § 18.2-386.1 (unlawful creation of an image of another).

## **CONCLUSION**

15. Based on the foregoing, there is probable cause to believe that **Brian Jeffrey Raymond (DOB** ▮▮▮▮▮▮**)** induced AV-4 to travel for the purpose of engaging in any sexual activity for which any person can be charged with a criminal offense, in violation of 18 U.S.C. § 2422(a).

Respectfully submitted,

Erin Sheridan, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 8th day of October 2020.

2020.10.08
20:23:48 -04'00'

G. MICHAEL HARVEY,
UNITED STATES MAGISTRATE JUDGE